THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　　　*
　　　　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　　　*
v.　　　　　　　　　　　　　　　　*　　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　　*
$218,615.57 in U.S. Currency, more or　*
less, seized from First National Bank　*
of Omaha accounts ending in　　　　　*
4963, 8073, and 3001,　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　Defendants.

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

COMES NOW the United States of America, by and through Kenyen R. Brown, United States Attorney for the Southern District of Alabama, and Alex F. Lankford, IV, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture In Rem, with the following allegations:

## NATURE OF THE ACTION

1.　　This is a civil action for forfeiture brought against the above-referenced defendant in rem, to enforce: 18 U.S.C. § 981(a)(1)(C), which subjects to civil forfeiture property which constitutes or is derived from proceeds traceable to a violation of an offense constituting "specified unlawful activity" as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1)(A), or a conspiracy to commit such offense,

1

namely, 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C.§ 1349 (conspiracy to commit wire fraud).   This action is further brought to enforce 18 U.S.C. § 981(a)(1)(A), as property involved in a financial transaction or attempted financial transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property (money laundering).

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture in rem under 28 U.S.C. § 1355(a).

3.     Venue is proper in this Court based on 28 U.S.C. § 1355(b)(1)(A), as the district in which acts or omissions giving rise to the forfeiture occurred, and 28 U.S.C. § 1395(a), because the action accrued in this district.

## THE DEFENDANT IN REM

4.     The defendant is $218,615.57 in U.S. Currency, more or less, which was seized from the following First National Bank of Omaha accounts pursuant to a seizure warrant in the amounts specified: $45,647.91, from one ending in 4963; and $100.00, from one ending in 8073; $172,967.67, from one ending in 3001. Following service of the seizure warrant, the First National Bank of Omaha, . Omaha, Nebraska, forwarded a check payable to the U.S. Secret Service, Mobile,

2

Alabama, which it submitted for deposit into the U.S. Treasury Suspense Account, Federal Reserve Bank of New York, New York, where it is being held pending final disposition.

## SUPPORTING FACTS

5.      Advertisements on websites are used to advertise or market products and services to internet shoppers.

6.      Affiliate marketing is internet performance-based marketing which, by using an individual's websites or advertisements, directs traffic from one website in the "network" to another, and the originating site receives credit for either pay per click (PPC) or pay per action (PPA) if the user travels to the website.

7.      A pay per click (PPC) credit begins when an internet shopper clicks on an advertisement on the website.   If a shopper clicks on the ad, then a piece of data is sent from the website with the ad to the shopper's computer, which is known as a "cookie".   This "cookie" carries unique identifying data.   If the shopper with the attached "cookie" leaves the website and then goes to the website advertised, then the website to which the shopper was redirected recognizes the unique data in the "cookie" carried by the shopper's computer.   This internet advertisement traffic on a PPC site will generate revenue for the website which displayed the ad the shopper clicked on.

8.     The other method of receiving credit is called pay per action (PPA). With PPA, an internet shopper must make a purchase on the website the ad directed the shopper to for the site displaying the ad to be credited, but the process of travel and "cookies" remain the same.

9.     Affiliate Marketing programs sometimes have weaknesses in their fraud detection software. These weaknesses may be discovered and exploited by individuals who for financial gain develop schemes to defraud the persons involved in affiliate marketing.

## Investigation

10.     Jefferson McKittrick, Jesse Neubert, and others operated such a scheme to defraud, commonly known as "cookie stuffing," using affiliate marketing programs.   Through this scheme McKittrick, Neubert, and others created "forced clicks" by unsuspecting web shoppers, which allowed McKittrick, Neubert, and others to receive commissions for sales they did not generate, which defrauded legitimate advertisers and the company which paid for the advertising.   This was done primarily through LinkShare Corporation and Google, to victimize Fareportal, Inc.   During the course of the conspiracy McKittrick received approximately $1,830,000.

4

11.     During the investigation, USSS Special Agent Joseph Lea was able to obtain a program that enabled him to observe all information, including "cookies," sent to and from a web site during a browsing session.   With a clean laptop and the program, Agent Lea visited the Onetravel.com website through entry of the website's URL in the address bar.   While navigating the page, a false or "forced click" cookie was loaded on the clean computer indicating that he was directed there by the affiliate code assigned to McKittrick.

12.     Agent Lea was able to capture and decompile the flash image of that advertisement, which revealed deceptive coding.   It contained features designed to avoid detection by Google's fraud detection.   The advertisement that placed the "forced click" tracking "cookie" on the clean computer was a Google AdSense ad.

13.     LinkShare had emailed McKittrick on September 25, 2012, which was titled "CEASE AND DECISIST: 2692635 Sanyo Phones.", and stated:

> "As you know, we spoke about your girlfriend's account as well as your account.   Based on our conversation, I warned about our policy regarding "forced clicks" via adware. Well, we finally have evidence that you are also buying ad campaigns through Ad Network.   We found that you are automatically invoking your affiliate tracking code for CheapOair without end users knowledge.   As you know, LinkShare does not allow adware applications to create "forced clicks" of Linksynergy.com.   We warned you about this last month. Unfortunately, you did not comply. Therefore, your account is now in jeopardy of being terminated."

5

14.     LinkShare had initiated its own investigation when McKittrick's revenue doubled to over $100,000 a month, in less than a month's time.

15.     Neubert received several similar e-mails from LinkShare Security, which started on February 12, 2012. Those e-mails also cited concerns of "forced click" fraud.

16.     Documents from affiliate marketing websites Linkshare, Market Trend, and others, show that McKittrick operated several online accounts listed in his own name as well as several others including accounts in Neubert's name.   The revenues received in McKittrick's accounts were primarily from affiliates owned by Fareportal, Inc.   LinkShare's web traffic reports detailed the number of traffic clicks and where the clicks originated.   In most cases, the uniform resource locator (URL), or website addresses that originated the clicks, were not present.   When the URL was not present, it was typically due to employment of a masking or "cloaking" program by the affiliate to prevent the detection of the URL.   Use of such a program generates a false location of the computer or otherwise disguises the location of the computer which made the click.

17.     In an email from McKittrick to Neubert, dated November 25, 2012, McKittrick stated: "ohh also, anotherd evelopement, i am purchasing Shadowmaker Cloaking for 3500.00 tomorrow also, its the best cloaker on the market, and I believe it will help us in the long run getting traffic for downloads :)"

18.     The e-mail correspondence between McKittrick and Neubert, which involved the use of wire transmissions to further the scheme, centered around recruitment of individuals to open accounts and coaching them on what to say, and McKittrick's operation and management of the accounts.   McKittrick would access his e-mail hosted on a server located outside of the state of Alabama from a computer located within the Southern District of Alabama.   McKittrick made reference to creating a "script," or segment of computer code, that would show that the marketing traffic was coming from Google and another program to hide the source of the traffic from the affiliates.   There are also references to attempts to conceal the funds paid between them.   Additional e-mails detail their intentions of making as much money as possible through any means necessary.

19.     McKittrick and Neubert had met through the website Blackhatworld.com (BHW).   Early email messages between them specifically reference the type of activity in which the two would agree to partner.   Those messages are excerpted below:

From McKittrick:  Please dont tell anyone though and keep this
venture between us, to keep footprints away and keep this method on
the down low ..lol . . .   ALso, wanted to let you know..That I have been
perfecting another method I am doing..and I am banking MAJOR
money with it.. The problem is, I cant bank that much in 1 account, I
have to spread the earnings,..So if you want in on it.. I If you have a
linkshare account..I can do it with you, and I will put starting out only
3K a month in it, because I have to start it slow, but then the next month
go up to 4K then 5k and so on..etc..etc.. . . . .     The linkshare will
100% be the number I say, because I could LITERALLY make 25K a
day if I wanted too, but ..lol. It would get banned. . . ."

Their communication continued:

> 9/20/2011 from McKittrick: Dont post in thread that you are doign this,
> because it leaves a foot print and I dont like footprints..lol. . . . .

> 9/20/2011 Reply from Neubert:   I agree. That is why I have not
> posted any feedback there. I figure the more low key the better.
> As soon as people start talking all over the place that is when this
> kind of stuff get's shut down."

20.    Other e-mail correspondence between Neubert and McKittrick

involved discussions about opening different accounts and methods of exploiting

those accounts to receive the highest levels of revenue, all while avoiding detection

and being shut down.   In one such e-mail to McKittrick on October 18, 2011,

Neubert wrote:

> Lastly, I noticed a couple guys on BHW said they got hit by Amazon
> doing BH stuff and lost some big $$$.  . . .

21.   In another e-mail to McKittrick on October 25, 2011, Neubert detailed

how he was attempting to prevent detection:

> When opening the accounts I am using different proxies (buying some
> more for this expansion today), and I am using CCleaner to delete all
> records, cookies, history, etc PLUS checking manually before signing
> up. This has been my process from the beginning.
> Each account is under a legit new person (name, address, phone, SSN
> for taxes/W9). . . .
> 8 x 3 = 24 which would be more than enough to accept all payments and
> spread them out over 3 PayPal accounts.
> HOWEVER, now that we are expanding this much, do I really need to
> have those paid into the account owner's PayPal > have the account
> owner send my my cut > then I send you your cut????

22.   This was in response to an e-mail from McKittrick earlier that day

which stated:

> MAKE SURE when opening these accounts you are using
> DIFFERENT proxies     and erasing your cookies before going to new
> account.. Have to be VERY careful,    because this is alot of money,..

23.     Records of LinkShare reviewed by Agent Lea show that beginning in early October 2011, Neubert's LinkShare account ending in 8035, coded with LinkShare affiliate ID: uk0mNYmUWoo, was paid in excess of $400,000.00. These funds were deposited into Neubert's First National Bank of Omaha accounts ending in 4963 and 3001.   Another LinkShare account held by Neubert's family member which was controlled by him, earned $244,035.00, from its opening on the same date.   All of these monies, which totaled over $651,000, were deposited into the three Bank of Omaha accounts the contents of which were seized in May 2014.

24.     McKittrick was paid in excess of $400,000 by Neubert from proceeds from these accounts via payments from both PayPal and from First National Bank of Omaha accounts.

25.     Soon after Neubert began receiving commission payments from LinkShare in October 2011, a portion of the funds began to be transferred from his bank accounts, into a PayPal account in his name.   Once the funds were transferred into the PayPal account, they were deposited into McKittrick's PayPal account on forty two different occasions from October 7, 2011 to October 3, 2012, which totaled $263,593.94.   Records from PayPal show that access to the account after each deposit was made by McKittrick from the IP address assigned to McKittrick's residence within the Southern District of Alabama.

26.    On June 5, 2013, a search and seizure warrant was executed at McKittrick's residence.

27.    Agent Lea interviewed McKittrick, who stated that to complete the fraud at LinkShare, he used the method received from an overseas contact, which was a "cookie stuffing" script, which exploited a flaw in Google Adsense advertisements.   McKittrick further stated that he partnered with Neubert to conduct his fraud scheme with LinkShare.   With Neubert's help, he recruited and managed numerous other accounts, which utilized the "forced click" fraud scheme at LinkShare.   According to McKittrick, Neubert recruited account holders and opened LinkShare accounts in the recruited individual's names, and McKittrick set up the fraudulent coding and advertising.   McKittrick said that Neubert had paid him in excess of $400,000 from proceeds from these accounts via payments from both PayPal and from First National Bank of Omaha accounts ending in 4963 and 3001.

28.     As to the First National Bank of Omaha account ending in 8073, from which $100.00 was seized, this account like the others received LinkShare deposits. For example, on January 8, 2012, $41,686.00 was deposited by LinkShare.   It was also used in what appears to be an attempt to launder funds.   For example, on December 16, 2013, $52,900.35 was transferred from the account ending in 8073 to the one ending in 3001.   The same day, $52,900.35 was transferred from the account ending in 3001, back into the one ending in 8073.

29.     Agent Lea reviewed account statements obtained from First National Bank of Omaha held in the name of Jesse Neubert, and in the name of Market Trend, Inc.   The Illinois Secretary of State's records reveal that Neubert is president of Market Trend, Inc., a Nevada corporation, registered to do business there.   The First National Bank of Omaha records revealed that the source of money going into the accounts was almost exclusively from Amazon and LinkShare, two businesses that participate in Affiliate Marketing advertising campaigns.   Other deposits included funds sent from individuals who were later determined to also be involved in the fraud scheme with LinkShare.

## COUNT ONE
## (18 U.S.C. § 981(a)(1)(C))
## (The defendant constitutes or is derived from proceeds traceable to an 18 U.S.C. § 1349 conspiracy to commit wire fraud)

30.     Plaintiff adopts and re-alleges paragraphs 1 through 29 above as if fully set forth herein.

31.     18 U.S.C. § 981(a)(1)(C) subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specific unlawful activity" (as defined in 18 U.S.C. §§1956(c)(7) and 1961(1)(A)), or a conspiracy to commit such an offense.

32.     The defendant is property which constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity," or a conspiracy to commit such offense, namely, a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1349.

33.     Based on the foregoing facts and circumstances, the defendant is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or derived from proceeds traceable to a violation of any offense constituting "specific unlawful activity" (as defined in 18 U.S.C. §§1956(c)(7) and 1961(1)(A)), or a conspiracy to commit such an offense, namely, a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1349.

## COUNT TWO
### (18 U.S.C. § 981(a)(1)(C))
### (The defendant constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1343, wire fraud)

34.     Plaintiff adopts and re-alleges paragraphs 1 through 29 above as if fully set forth herein.

35.     18 U.S.C. § 981(a)(1)(C) subjects to civil forfeiture any property, real or personal, which constitutes or derived from proceeds traceable to a violation of any offense constituting "specific unlawful activity" (as defined in 18 U.S.C. §§1956(c)(7) and 1961(1)(A)) , or a conspiracy to commit such an offense, namely, wire fraud, in violation of 18 U.S.C. § 1343.

14

36.    Based upon the foregoing facts and circumstances, the defendant is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or derived from proceeds traceable to a violation of any offense constituting "specific unlawful activity" (as defined in 18 U.S.C. §§1956(c)(7) and 1961(1)(A)) , or a conspiracy to commit such an offense, namely, wire fraud, in violation of 18 U.S.C. § 1343.

## COUNT THREE
### (18 U.S.C. § 981(a)(1)(C)) and (a)(1)(A))
### (The defendant constitutes or are derived from proceeds of a conspiracy to conduct financial transactions involving the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(h))

37.    Plaintiff adopts and re-alleges paragraphs 1 through 29 above as if fully set forth herein.

38.    18 U.S.C. § 1956(h) makes it unlawful for any persons to conspire to commit any offense defined in §§ 1956 and 1957.

39.    18 U.S.C. § 1956(a)(1)(A)(i) makes it unlawful to conduct or attempt to conduct financial transactions, knowing that the property involved represents the proceeds of some form of unlawful activity, which in fact involves the proceeds of illegal activity, with the intent to promote the carrying on of specified unlawful activity.

15

40.     18 U.S.C. § 1956(a)(1)(B)(i) makes it unlawful to conduct or attempt to conduct financial transactions, knowing that the property involved represents the proceeds of some form of unlawful activity, which in fact involves the proceeds of illegal activity, knowing that the transaction is designed, in whole or in part, to conceal or disguise, the nature, the location, the ownership, or the control of the proceeds of specified unlawful activity.

41.     18 U.S.C. § 1957 makes it unlawful to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which is derived from specified unlawful activity.

42.     18 U.S.C. § 981(a)(1)(C) subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity", as defined in 18 U.S.C. §§ 1956(c)(7) and 1961, including violation(s) of 18 U.S.C. § 1956 (relating to the laundering of monetary instruments), and § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

43.     18 U.S.C. § 981(a)(1)(A) subjects to civil forfeiture any property, real or personal, involved in a transaction, or attempted transaction in violation of §§ 1956, 1957, or 1960, or any property traceable to such property.

16

44.     Based on the foregoing facts and circumstances, the defendant property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a § 1956(h) conspiracy to violate § 1956 (relating to the laundering of monetary instruments), and/or § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

45.     Based on the foregoing facts and circumstances, the defendant property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as personal property involved in a transaction, or attempted transaction in violation of §§ 1956, and/or 1957, or property traceable to such property.

## COUNT FOUR
### 18 U.S.C. § 981 (a)(1)(C) and (a)(1)(A))
**(The defendant constitutes property involved in financial transactions involving the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956 (a)(1)(A)(i))**

46.     Plaintiff adopts and re-alleges paragraphs 1 through 29 above as if fully set forth herein.

47.      18 U.S.C. § 1956(a)(1)(A)(i), makes it unlawful to conduct or attempt to conduct financial transactions, knowing that the property involved represents the proceeds of some form of unlawful activity, which in fact involves the proceeds of illegal activity, with the intent to promote the carrying on of specified unlawful activity.

48.    The defendant was involved in financial transactions or attempted financial transactions, which in fact involved the proceeds of specified unlawful activity, namely, the proceeds of violation(s) of 18 U.S.C. §§ 1343 and/or 1349, which were conducted with the intent to promote the carrying on of the same specified unlawful activity.

49.    Based on the foregoing facts and circumstances, the defendant property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to specified unlawful activity, namely, violation(s) of 18 U.S.C. §§ 1343 and 1349.

50.     Based on the facts and circumstances, the defendant property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of §§ 1956 and/or 1957, or any property traceable to such property.

## COUNT FIVE
### 18 U.S.C. § 981(a)(1)(A)
**(The defendant constitutes property involved in financial transactions or attempted financial transactions involving the proceeds of specified unlawful activity, which in whole or in part, were conducted to conceal or disguise, the nature, the location, the ownership, or the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i))**

51.     Plaintiff adopts and re-alleges paragraphs 1 through 29 above as if fully set forth therein.

52.     18 U.S.C. § 1956(a)(1)(B)(i), makes it unlawful to conduct or attempt to conduct financial transactions, knowing that the property involved represents the proceeds of some form of unlawful activity, which in fact involves the proceeds of illegal activity, knowing that the transaction is designed, in whole or in part, to conceal or disguise, the nature, the location, the ownership, or the control of the proceeds of specified unlawful activity.

53.     Based on the foregoing facts and circumstances, the defendant was involved in financial transactions or attempted financial transactions, which in fact involved the proceeds of specified unlawful activity, which were conducted, in whole or in part, to conceal or disguise, the nature, the location, the ownership, or the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

54. Based on the foregoing facts and circumstances, the defendant property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of § 1956(a)(1)(B)(i), or any property traceable to such property.

## COUNT SIX
### 18 U.S.C. § 981(a)(1)(A))
**(The defendant constitutes property involved in monetary transactions in criminally derived property of a value of greater than $10,000, which was derived from specified unlawful activity, namely, wire fraud, in violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1957)**

55. Plaintiff adopts and re-alleges paragraphs 1 through 29 above as if fully set forth therein.

56. 18 U.S.C. § 1957 makes it unlawful to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which is derived from specified unlawful activity.

57. Based on the foregoing facts and circumstances, the defendant was involved in monetary transactions in criminally derived property of a value of greater than $10,000, which was derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

58.     Based on the foregoing facts and circumstances, the defendant

property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as

property involved in a transaction or attempted transaction in violation of § 1957, or

any property traceable to such property.

**WHEREFORE**, the United States of America requests that the defendant be

forfeited and condemned to the United States of America; that it be awarded its costs

and disbursements in this action; and that it be granted such further relief as this

Court deems proper and just.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

By: _____
Alex F. Lankford, IV (LANKA0026)
Assistant United States Attorney
63 S. Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Facsimile: (251) 441-5051
E-mail: alex.lankford@usdoj.gov

## VERIFICATION

In accordance with 28 U.S.C. § 1746, I hereby declare as follows:

My name is Earl B. Hicks and I am employed by the United States Secret Service and have been so employed for approximately 19 years.

1.   I am a Special Agent with the United States Secret Service ("USSS") and has been so employed since September 1995.   I am currently assigned to the United States Secret Service Mobile Resident Office, Mobile, Alabama, where I serve as the Resident Agent In Charge.   Prior to receiving an appointment as a Special Agent with the USSS, I was employed as a State Trooper with the South Carolina Highway Patrol, where I served from August 1990 thru September 1995.   I have been formally trained as a Criminal Investigator at the Federal Law Enforcement Training Center in Glynco, Georgia and as a Special Agent at the USSS's James J. Rowley Training Center in Beltsville, Maryland.   My training included general law enforcement and criminal investigations, including financial investigations related to identity and document fraud, and counterfeiting.

My responsibilities include the investigation of possible criminal violations of the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, Unites States Code), and related offenses.   During my

assignment as a Special Agent, I have received extensive training from the USSS in conducting financial investigations.   I have also received training in money laundering and asset forfeiture.   I have performed complex financial investigations, and have participated in the execution of search and seizure warrants in the capacity of Affiant and/or participant.   The sources of my knowledge and information and the grounds of my belief are my education, training and experience as a law enforcement agent, information supplied to me by other law enforcement officers, including Agent Joseph Lea, information supplied by confidential and cooperating individuals, and other information I gathered or have been made aware during the investigation of this case.   This Verified Complaint In Rem does not contain all the facts of which I have knowledge as a result of my and Agent Lea's involvement in this investigation.

   I have read the Supporting Facts and Investigation sections of the foregoing Verified Complaint in Rem, know the contents thereof, and I hereby verify and declare under penalty of perjury that the matters contained therein are true and correct to the best of my knowledge, information and belief.

Earl B. Hicks, S/A, USSS,
Declarant

## CERTIFICATE OF SERVICE

On the 28th day of October, 2014, I certify that pursuant to Supp. R. For Adm. M. and Forf. Claims G(4)(b), I sent the attached Notice of Judicial Forfeiture Proceeding, a copy of the Complaint In Rem, and a copy of the Warrant For Arrest, via certified U.S. Mail, return receipt requested to the following:

Jesse Neubert
601 Heustis Street
Eureka, IL 61503

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

By: _____
Alex F. Lankford, IV (LANKA0026)
Assistant United States Attorney
63 S. Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Facsimile: (251) 441-5051
E-mail: alex.lankford@usdoj.gov